12 F.3d 1100
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Norris G. CHAPMAN, Plaintiff/Appellant,
v.
U.S. STEEL DIVISION OF U.S.X., Gary Works, Defendant/Appellee.
 No. 93-1644.
 United States Court of Appeals, Seventh Circuit.
 Submitted Nov. 19, 1993.[1]
Decided Nov. 23, 1993.
 
 Before BAUER and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 
 ORDER
 
 1
 Norris Chapman filed a Title VII action, alleging that his employer, U.S. Steel ("USS"), terminated his employment because of his race. In pursuing his Title VII claim, Chapman flooded the district court with over 40 discovery motions, pleadings, and amendments. At the close of discovery, USS filed a motion for summary judgment. Six weeks later and one month before trial, Chapman moved for joinder of claims under 42 U.S.C. Sec. 1981 and the National Labor Relation Act ("NLRA").
 
 
 2
 The district court granted USS's motion for summary judgment, finding that USS had legitimately discharged Chapman based on his disciplinary record. The district court denied Chapman's "eleventh hour" joinder motion as untimely and denied all remaining motions as moot. Chapman asks this court to "remand the case to the lower district court for trial by jury, and without a joinder of parties, but with a joinder of claims." We decline to do so.
 
 
 3
 After de novo review of the record and briefs, Phillips v. Lincoln Nat. Life Ins. Co., 978 F.2d 302, 307 (7th Cir.1992), we conclude that Chapman has not provided sufficient evidence upon which a reasonable person could properly base a verdict in his favor. House v. Belford, 956 F.2d 711, 722 (7th Cir.1992). We affirm the district court's grant of summary judgment for the reasons stated in the order, dated Feb. 22, 1993, attached hereto.
 
 
 4
 Rule 18(a), Fed.R.Civ.P., permits the liberal joinder of claims. However, each joined claim, potentially the basis of separate litigation, must have the same foundation it would have needed if the claims had been pursued separately. Frantz v. U.S. Powerlifting Fed'n, 836 F.2d 1063, 1067 (7th Cir.1987). Accordingly, since we affirm the district court's grant of summary judgment on Chapman's Title VII claim, joinder of Chapman's Sec. 1981 claim, even if proper, is barred. An employee, such as Chapman, who is claiming racial discrimination, must bring both his Title VII and Sec. 1981 claims at the same time to avoid res judicata. See Hussein v. Oshkosh Motor Truck Co., 816 F.2d 348, 356 (7th Cir.1987) (applying the "same transaction" test).
 
 
 5
 With regard to Chapman's motion to join a claim under the NLRA, we note that he has failed to state a claim for relief. Fed.R.Civ.P. 8(a). Chapman's joinder motion, merely six sentences, fails to allege how USS violated the NLRA, what section of the Act forms the basis for the claim, or any supporting facts. See Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir.1992) ("[A] court should ask whether relief is possible under any set of facts that could be established consistent with the allegations").
 
 
 6
 Furthermore, we will uphold decisions denying leave to amend where plaintiffs seek to add new claims on the eve of trial. See Campbell v. Ingersoll Mill. Mach. Co., 893 F.2d 925, 927 (7th Cir.), cert. denied, 111 S.Ct. 127 (1990) ("Eleventh hour additions of new legal and factual theories inevitably require new rounds of discovery and additional legal research. This is bound to produce delays that burden not only the parties to the litigation but also the judicial system and other litigants."). The district court correctly denied Chapman's motion. For the aforementioned reasons, we AFFIRM.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE NORTHERN DISTRICT OF INDIANA
 HAMMOND DIVISION
 
 7
 Norris Chapman, Plaintiff,
 
 
 8
 vs.
 
 
 9
 U.S. Steel Division of U.S.X., Gary Works, et al., Defendants.
 
 
 10
 Civil No. H92-89.
 
 
 11
 Feb. 22, 1993.
 
 ORDER
 
 12
 This matter is before the Court on Motion of Defendant U.S. Steel Division of U.S.X. ("USS") for Summary Judgment, filed on December 15, 1992. For the following reasons, it is hereby ORDERED that the Motion is GRANTED.
 
 BACKGROUND
 
 13
 ON JULY 11, 1991, PLAINTIFF, NORRIS CHAPMAN ("CHAPMAN"), FILED WITH THIS COURT A COMPLAINT AND MOTION FOR OTHER RELIEF. IN HIS COMPLAINT, CHAPMAN ALLEGED THAT USS DISCRIMINATED AGAINST HIM BY TERMINATING HIS EMPLOYMENT BECAUSE OF HIS RACE ON OCTOBER 2, 1990. ON MARCH 9, 1992, CHAPMAN'S APPLICATION TO PROCEED IN FORMA PAUPERIS WAS GRANTED AND A SUMMONS WAS ISSUED FOR CHAPMAN'S COMPLAINT.[1]
 
 
 14
 The undisputed facts are as follows: Chapman began his most recent period of employment at USS's Gary Works on July 6, 1978. Starting as an Apprentice, by 1988 Chapman became a Journeyman Millwright Expanded. During the term of his employment, Chapman was represented by the United Steelworkers of America and its local union No. 1014 ("USW"). The terms and conditions of his employment were governed by a USS-USW Basic Labor Agreement ("the Agreement"). The Agreement contained a grievance arbitration procedure for handling employee grievances resulting from employees' beliefs that USS had violated the Agreement.
 
 
 15
 In the eleven month period prior to October 2, 1990 (on which date the incident which led to Chapman's discharge occurred), USS disciplined Chapman six separate times for violating plant conduct rules. These offenses included throwing an air impact wrench, using threatening language towards a supervisor, violating safety regulations, absenteeism, leaving a job incomplete, and failure to perform an assigned job.
 
 
 16
 On September 21, 1990, Chapman burned his wrist at work. He was placed on light duty but continued to report to work. However, Chapman's immediate supervisor, Maintenance Shift Manager Dziubla ("Dziubla"), received so many complaints about Chapman not working at all, that USS determined that Chapman should be sent to the Gary Works medical dispensary to obtain a medical evaluation. It was determined that if Chapman did not receive a release to perform all aspects of his regular job, he would have to go on sick leave, as USS had no use for him if he could not perform any work at all. Accordingly, on October 1, 1990, USS directed Chapman, in the presence of his USW Assistant Grievance Committeeman, to report to the dispensary before reporting to work the next day, October 2, 1990.
 
 
 17
 Rather than first going to the Gary Works dispensary, on October 2, 1990, Chapman reported, as in the past, at a lineup to receive work instructions. When Dziubla saw Chapman in the lineup shanty, he asked Chapman what he was doing there, as Chapman had been ordered to go to the dispensary before reporting for work. Chapman replied to this question by calling Dziubla an obscene name and remarking that it was his interpretation that he was to come to work first and then go to the dispensary. At this time, Dziubla instructed Chapman to leave the lineup and go to a supervisor's office immediately. Chapman responded by saying he was not going anywhere with Dziubla. Finally, after Dziubla instructed Chapman two or three times to come to the office, Chapman left the lineup with Dziubla. As a result of Chapman failing to follow his supervisor's instructions he was issued a five day suspension. This was the first of two disciplinary suspensions involved in this case.
 
 
 18
 The second disciplinary suspension resulted from the exchange between Dziubla and Chapman immediately following the above events. While Chapman was walking with Dziubla from the shanty to the supervisor's office, Chapman "reached up with the hand that was bandaged in a reflex action out of anger and grabbed the end of Dziubla's cigar." (Chapman Dep. at p. 74, Nov. 23, 1992) Chapman further stated that, "I had grabbed and held it and I watched him let his teeth go off it, and I took it out of his mouth and I threw it on the ground, and I took all my frustrations out on the cigar." Id. When Dziubla asked Chapman why he did this, Chapman replied "I'm going to do a lot more than that." Id. at 77.
 
 
 19
 Because Chapman pulled the cigar out of Dziubla's mouth, threw it on the ground, and threatened Dziubla--"I'm going to do a lot more than that"--on October 2, 1990, USS disciplined Chapman for threatening his supervisor by suspending him for five days.
 
 
 20
 Under the USS-USW Basic Labor Agreement, a due process hearing must be held before an employee covered by the Agreement can be discharged. This hearing is called a "Section 8-B" hearing, after Section 8-B of the Agreement. Subsequent to the 8-B hearings on the two suspensions, Area Manager of Service Maintenance, T.W. Yearsich ("Yearsich"), decided that the offenses which Chapman had committed (insubordination and threatening a supervisor) required that USS discharge Chapman. Yearsich based the discharge decision on Chapman's prior disciplinary record, Chapman's lack of response to USS's rehabilitation efforts, the threatening phone calls Chapman made five months earlier to Mrs. Donaldson, a supervisor's wife, and Chapman's job performance. Yearsich states in his affidavit that he alone made the decision to discharge Chapman.
 
 
 21
 After Chapman was discharged, he filed a grievance under the Agreement, which was ultimately heard before the USS-USW Board of Arbitration. During arbitration, Chapman was represented by USW. On June 27, 1991, the USS-USW Board of Arbitration found that USS had just cause for discharging Chapman for threatening a supervisor. Chapman also filed and lost grievances before the Gary Human Relations Commission ("GHRC"), the Equal Employment Opportunity Commission ("EEOC"), and the Indiana Employment Compensation Agency.
 
 
 22
 Chapman alleges that USS had a racial animus in discharging him. In order to support this claim, he relies solely on one incident several months prior to his October 1990 discharge. The following is an excerpt of Chapman's deposition:
 
 
 23
 Q. [USS Counsel] Now in this charge [GHRC/EEOC], you say that the company discharged you because of your race, is that correct?
 
 
 24
 A. [Chapman] Yes.
 
 
 25
 Q. What facts do you have to support that, Mr. Chapman?
 
 
 26
 A. The actions of Mr. Dziubla, who is an agent of the company. His words, actions and deeds expressed racial animosity, and so I didn't really--I wasn't really able to--there was a--what do you call it--an unanswered question in my mind until Dziubla expressed himself.
 
 
 27
 When he expressed himself, then I got--I felt that it was racial.
 
 
 28
 Q. You felt that it was racial, and it's--okay. Let's--lawyers like to do things in little steps and little pigeonholes.
 
 
 29
 The support you have for your allegation that you were discharged because of your race only concerns one supervisor, Ed Dziubla, is that correct?
 
 
 30
 A. Yes, he's the only one that was putting racial connotations to what was going on.
 
 
 31
 Q. Okay. Now--
 
 
 32
 A. Before that, anybody could have--it could have been they just don't like me as a person.
 
 
 33
 Q. Correct.
 
 
 34
 A. Or I am just somebody they don't like, but when he said that--
 
 
 35
 Q. Said what?
 
 
 36
 A. When he said, "why doesn't Thurgood Marshall retire?", Then I knew what he meant. It wasn't jus that I was black, but I was a certain kind of black that he didn't like.
 
 
 37
 Q. When did Mr. Dziubla make this remark?
 
 
 38
 A. It was during the time that there was a lot of publicity on television and in the papers about this Souter.
 
 
 39
 Q. Dave Souter, David Souter being nominated to the Supreme Court?
 
 
 40
 A. Yes, and so he said this Thurgood Marshall made some statements on television or something, but I had never been in any kind of political discussion with anybody at work.
 
 
 41
 Q. When did Mr. Dziubla make this remark about Thurgood Marshall?
 
 
 42
 A. At the lineup in front of the whole lineup. He came in with a sneer and said--
 
 
 43
 Q. The date; give me the date.
 
 
 44
 A. I'll have to--
 
 
 45
 Q. Well, you began working in this area in--
 
 
 46
 A. July.
 
 
 47
 Q. July of what?
 
 
 48
 A. 1990. I started working for Dziubla in July of 1990.
 
 
 49
 Q. Okay.
 
 
 50
 A. So between July--I think it was August of 1990 that this all occurred.
 
 
 51
 Q. And who heard besides you Dziubla make this remark?
 
 
 52
 A. Mike Cornfield, Mike Ivanovich, Art DeLeon, Ed Brewer, John Mays.
 
 
 53
 That's all I can think of.
 
 
 54
 Q. Any supervisors?
 
 
 55
 A. No.
 
 
 56
 Q. Now you feel that the company made their decision to discharge you because of your race--black, because of what Ed Dziubla said in August of 1990; his statement was, "Why doesn't Thurgood Marshall retire?" Are we together so far?
 
 
 57
 A. Right.
 
 
 58
 Q. and there's only one Foreman that you point your finger at whoever made such a remark or exhibited anti-black behavior, correct?
 
 
 59
 A. Right.
 
 
 60
 Q. And as to that, Foreman Ed Dziubla, it was only one remark he made, that correct?
 
 
 61
 A. It was the only direct unquestionable remark.
 
 
 62
 Q. Of race?
 
 
 63
 A. Of race that ever came up.
 
 
 64
 (Chapman Dep. at pp. 95-98)
 
 DISCUSSION
 
 65
 Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); First Wis. Trust Co. v. Schroud, 916 F.2d 394, 398 (7th Cir.1990). In other words, the record must reveal that no reasonable jury could find for the nonmovant. Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 335 (7th Cir.1991); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, the Court must read all facts in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255; Richardson v. Penfold, 839 F.2d 392, 394 (7th Cir.1988).
 
 
 66
 The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Becker v. Tanenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir.1990); Schroeder v. Lufthansa German Airlines, 875 F.2d 613, 620 (7th Cir.1989). "Whether a fact is material depends on the substantive law underlying a particular claim and only disputes over facts that might effect the outcome of the suit under governing law will properly preclude the entry of summary judgment.' " Walter v. Fiorenzo, 840 F.2d 427, 434 (7th Cir.1988) (citing Anderson, 477 U.S. at 250-252)).
 
 
 67
 "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." Beard v. Whitley County REMC, 840 F.2d 405, 410 (7th Cir.1988). Therefore, if a party fails to establish the existence of an essential element of its case on which it bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be " 'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 324 (1986).
 
 
 68
 Chapman contends that he was discharged because of his race in violation of Title VII of the Civil Rights Act of 1964. Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ..." 42 U.S.C. Sec. 2000(e)-(2). The United States Supreme Court has delineated a burden shifting formula for determining discrimination claims under Title VII. McDonald Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973). The Seventh Circuit has most recently articulated this standard in Samuelson v. Durkee/French/Airwick, 976 F.2d 1111 (7th Cir.1992). Under this formula, the Plaintiff bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. Id. at 1113. Chapman can establish a prima facie case of discrimination by showing: (1) he was a member of a protected class; (2) he was satisfactorily performing the duties of his position; (3) he was discharged; and (4) others not in the protected class were treated more favorably. Id. Once a plaintiff meets that burden, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its action." Id. If the defendant meets the burden, the presumption of discrimination is dissolved, and the burden is again shifted to the plaintiff to prove the defendant's articulated nondiscriminatory reason was in fact a pretext for discrimination. Id.
 
 
 69
 In order to show pretext, a plaintiff may show "either that a discriminatory reasons more likely than not motivated the employer or that the employer's proffered explanation is incredible." Id. at 1114 (quoting Oxman v. WLS-TV, 846 F.2d 448, 453 (7th Cir.1988)). The Plaintiff can show that the Defendant's proffered reasons are incredible by showing that "(1) they have no basis in fact, or (2) they did not actually motivate the employer's decision, or (3) they were insufficient to motivate the discharge." Id. (quoting Jones v. Jones Bros. Constr. Corp., 879 F.2d 295, 299 (7th Cir.1989)). While this analysis outlines the shifting burden of production on the parties, the ultimate burden rests with the employee to prove that the employer intentionally discriminated against the employee. Id. (citation omitted).
 
 
 70
 Reviewing in the light most favorable to Chapman the pleadings, depositions, affidavits, and the inferences which can be drawn, the Court finds that Chapman is unable to bear the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. There is no dispute that Chapman, an African-American, is a member of a protected class. There is also no dispute that he was discharged. However, the evidence is simply insufficient to show that Chapman was satisfactorily performing the duties of his position. Also, Chapman has provided no evidence that others not in the protected class were treated more favorably.
 
 
 71
 It is clear from the record in this case that Chapman was discharged because of his poor employment record. As outlined above, in addition to the two incidents which directly led to Chapman's discharge, in the eleven month period prior to these two incidents, USS disciplined Chapman six separate times for violating the plant conduct rules. These offenses were serious, including throwing tools, threatening a supervisor, absenteeism, and making harassing phone calls to the wife of a supervisor. In short, Chapman has not provided any evidence which would allow the conclusion that he was satisfactorily performing the duties of his position. Furthermore, he has not provided any evidence that others not in the protected class, i.e. those who are not African-American, were treated more favorably.
 
 
 72
 To support his claim of discrimination based on race, Chapman relies solely on the August 1990 exchange between himself and Dziubla regarding the retirement of Justice Thurgood Marshall. This isolated conversation, which occurred two months prior to the incidents leading to Chapman's discharge, is simply not enough evidence to establish discrimination based on race. As explained in the plurality opinion of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), discussing discrimination based on gender: "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision." 490 U.S. at 251. Justice O'Connor's concurring opinion expanded on this theme, rejecting the contention that stray, isolated remarks could form the basis for a finding of employment discrimination: "[S]tray remarks in the workplace ... cannot justify requiring the employer to prove that its ... decisions were based on legitimate criteria. Nor can statements by nondecisionmakers or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard." 490 U.S. at 277. See also McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683 (7th Cir.1991). "Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." McCarthy, 924 F.2d at 686-87.
 
 
 73
 Chapman has not shown that the remarks regarding Justice Thurgood Marshall were in any way related to his subsequent discharge two months later. The conversation occurred in August 1990 between Dziubla and Chapman, but the decision to discharge Chapman as a result of his multiple disciplinary infractions was made solely by Area Manager Yearsich after Chapman's 8-B hearing in October 1990. Furthermore, Chapman admits that the Thurgood Marshall question is the only piece of evidence on which his claim of racial discrimination is premised. Accordingly, Chapman has failed to establish a prima facie case of discrimination based on race.
 
 
 74
 Assuming arguendo that Chapman established his prima facie case for intentional race discrimination, USS has met its burden of articulating a legitimate nondiscriminatory reason for its decision to terminate Chapman. The record demonstrates that Chapman had numerous disciplinary offenses in the year prior to his discharge. Additionally, before his two 5-day suspensions were converted to discharge, an 8-B hearing was held pursuant to the Labor Agreement. After this hearing, Yearsich made the decision that the offenses which Chapman had committed warranted his being discharged. Accordingly, USS has met its burden of showing a nondiscriminatory reason for terminating Chapman.
 
 CONCLUSION
 
 75
 For the reasons stated herein, USS's Motion for Summary Judgment is hereby GRANTED. Chapman's remaining motions are DENIED as MOOT. Additionally, Chapman's eleventh hour filing of January 29, 1993, seeking to join additional causes of action, is DENIED as untimely. The Clerk of the Court is hereby ORDERED to enter final judgment in favor of USS and against Chapman on all of his claims.
 
 ENTER: 2/22/93
 
 76
 ------------/s/ Rudy Lozano
 
 
 77
 ------------RUDY LOZANO, Judge
 
 
 78
 ------------United States District Court
 
 
 
 [1]
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal is submitted on the briefs and record
 
 
 [1]
 Chapman never served the "Doe 1 and Each of Them" with a summons and complaint. Hence, the only Defendant in this case is USS